AO 91 (Rev. 11/11) Criminal Complaint

E-filing

FILED

APR - 2 2012

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND



# UNITED STATES DISTRICT COURT

for the

Northern District of California

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) |
| Isaac Darrell BUFFIN, Anthony Jose MEYERS, Kelvin Tyray MCALLISTER, Patrick Anthony JACKS, Antonio Manzia MCBRIDE, and Azeem Najee AHMAD | ) ) ) ) |
| *Defendant(s)* | ) |

Case No.

**4-12-70364 MAG**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____March 30, 2012_____ in the county of _____Alameda_____ in the _____Northern_____ District of _____California_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846, 841(a)(1)(A) | Conspiracy to Distribute and to Possess with Intent to Distribute 5 Kilograms or More of Cocaine |
| | Maximum Penalties: Maximum term of imprisonment of life; mandatory minimum term of imprisonment of 10 years; mandatory minimum 5 years of supervised release; $10,000,000 fine; and $100 special assessment. |

This criminal complaint is based on these facts:

See attached AFFIDAVIT OF ATF SPECIAL AGENT DANIEL W. DEMAS

Approved as to form _____ AUSA Natalie Lee

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Daniel W. Demas, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____4/1/12_____

_____
*Judge's signature*

City and state: _____

Honorable Donna M. Ryu, Magistrate Judge
*Printed name and title*

## AFFIDAVIT OF ATF SPECIAL AGENT DANIEL W. DEMAS

## IN SUPPORT OF CRIMINAL COMPLAINT

I, Daniel W. Demas, being duly sworn, depose and state as follows:

## I.     INTRODUCTION

1.     I am a Special Agent (SA) with the United States Bureau of Alcohol, Tobacco,
Firearms and Explosives (ATF) and have so been employed since February of 2009. I am
presently assigned to the ATF San Francisco Metro Field Office in San Francisco, California. I
am a law enforcement officer of the United States within the meaning of Title 18, United States
Code, Section 2510(7). I was trained as an ATF Special Agent at the Federal Law Enforcement
Training Center in Glynco, Georgia. I am also a graduate of the Saint Louis County and
Municipal Police Academy.

2.     As an ATF Special Agent, I have conducted and participated in both state and
federal investigations involving the trafficking of firearms and distribution of controlled
substances. I have investigated and assisted in the prosecution of criminal street gangs engaged
in illegal narcotics and firearms trafficking. During these investigations, I have participated in
various types of investigative techniques, including electronic surveillance; undercover agents
and informants; and controlled purchases of firearms and narcotics from suspects. I have
participated in physical surveillance operations and have participated in the execution of state
and federal arrest warrants and search warrants. In addition to utilizing the aforementioned
investigative techniques, I have been required during these investigations to analyze information
resulting from traditional record searches, pen registers and trap and trace devices, financial
records, utility records, and telephone toll and subscriber records.

3.  I submit this affidavit in support of a Criminal Complaint charging the following individuals with committing the offense of Conspiracy to Distribute and to Possess with the Intent to Distribute 5 Kilograms or More of Cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1)(A):

- Isaac Darrell BUFFIN (B/M, DOB: 01/26/1990)

- Anthony Jose MEYERS (B/M, DOB: 09/07/1983)

- Kelvin Tyray MCALLISTER (B/M, DOB: 11/23/1975)

- Patrick Anthony JACKS (B/M, DOB: 07/14/1981)

- Antonio Manzia MCBRIDE (B/M, DOB: 06/23/1984)

- Azeem Najee AHMAD (B/M, DOB: 03/24/1992)

4.  The statements contained in this Affidavit are based on my personal knowledge, and/or reliable information related to me by agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and others. Because of the limited purpose of this Affidavit, however, I have not included each and every fact known to me, but only those facts that I believe are necessary to establish probable cause in support of the requested complaint.

5.  Where statements made by other individuals (including other Special Agents and law enforcement officers) are referenced in this Affidavit, such statements are described in sum and substance and in relevant part only. Similarly, where information contained in reports and other documents or records are referenced in this Affidavit, such information is also described in sum and substance and in relevant part only.

## II.  CASE BACKGROUND

6.  On the afternoon of March 21, 2012, ATF Special Agent (SA) Ryan Stearman, SA Mark Demas, and SA Michael Ramos met with an ATF Confidential Informant (CI) to

discuss information the CI possessed regarding the involvement of Isaac Darrell BUFFIN (B/M, DOB: 01/26/1990) in the commission of robberies in and around Oakland, California. The CI stated to SA Stearman that BUFFIN has advised the CI in the past that BUFFIN has committed robberies and is interested in committing future robberies. The CI advised SA Stearman that the CI had informed BUFFIN on an unspecified date within the past week that the CI knew of an individual (Undercover ATF Agent) who may have information regarding a potential robbery of narcotics if BUFFIN was interested. The CI stated that BUFFIN expressed interest and requested that the CI arrange a meeting between BUFFIN and the individual (Undercover ATF Agent) with the information regarding the potential robbery. In the presence of the aforementioned agents, the CI telephonically contacted BUFFIN but the call was less than two minutes in duration and no discussion of any criminal activity occurred. BUFFIN then telephonically contacted the CI a few minutes later, while the CI was still in the presence of the agents, and BUFFIN indicated that he was near the CI's residence and wanted to meet the CI. The CI then departed the meeting with the agents. Approximately twenty minutes later, the CI telephonically contacted SA Stearman and indicated that BUFFIN was with the CI and that BUFFIN wanted to meet with SA M. Demas, who would act in an undercover capacity and be introduced to BUFFIN as the individual with information regarding a potential robbery of narcotics. The CI advised SA Stearman that the CI, BUFFIN, and another black male individual known only to the CI as "Carlton" were in the CI's vehicle and waiting to meet SA M. Demas in the parking lot of the Harley-Davidson motorcycle shop, located at 151 Hegenberger Road, Oakland, California.

3

III. · **PROBABLE CAUSE**

**The Undercover Meeting on March 21, 2012**

7.　　On March 21, 2012, at approximately 6:46 PM, ATF Special Agent (SA) Mark

Demas travelled to the area of 151 Hegenberger Road, Oakland, CA, for the purpose of meeting

Isaac BUFFIN to discuss the robbery of a drug "stash house".

8.　　SA M. Demas arrived at 151 Hegenberger and approached a parked vehicle

occupied by BUFFIN, the CI, and a black male (who later introduced himself as "Carlton"). SA

M. Demas told them to move to the adjacent lot so no one would see them meeting. Upon

moving to the adjacent lot, BUFFIN, the CI, and the as yet unidentified black male entered an

ATF Undercover Vehicle. Once inside, they exchanged greetings as BUFFIN introduced

himself as "Isaac," and the black male introduced himself to SA M. Demas as "Carlton".

9.　　Then, SA M. Demas advised that he needed to explain the details to BUFFIN and

Carlton; then, after hearing the specifics, if they were not interested, they could go their separate

ways and pretend to have never met. SA M. Demas explained to BUFFIN and Carlton that he

was a disgruntled courier of three (3) to four (4) kilograms of "coke" for a Mexican illicit drug

organization. SA M. Demas told BUFFIN and Carlton the organization ships the cocaine into

the Oakland area and then contacts SA M. Demas to come collect the cocaine. Once there, SA

M. Demas advised that he observes two (2) individuals in the residence containing the cocaine,

one of which was armed with a firearm. SA M. Demas further advised that while waiting to

collect his cocaine, he observes an additional four (4) to six (6) kilograms of cocaine in the

residence. SA M. Demas asked them if robberies of that type were something that they did.

BUFFIN said that it was "good, whenever you're ready we're ready". Carlton nodded in

agreement.

4

10. SA M. Demas then asked how they planned on doing it. BUFFIN stated that all SA M. Demas had to do was to get them to open the door for him, as they normally do, and the rest was up to BUFFIN and his crew. BUFFIN said that once they were inside they were going to "lay everybody down, you too" (referring to SA M. Demas). SA M. Demas asked how they meant "lay everybody down". BUFFIN smiled and said "not like that" (reference to killing everyone) and Carlton said that they were not going to hurt SA M. Demas. BUFFIN went on to state that they would make it look "real good", like SA M. Demas was not involved.

11. SA M. Demas told BUFFIN and Carlton that there was never any money in the house. Further, SA M. Demas advised that there would only be the kilograms of cocaine and if they did not have a way to get rid of it, the robbery would be worthless to them. BUFFIN and Carlton both acknowledged that they had an outlet for the cocaine and could get rid of it. Again SA M. Demas stated that if they did not want to do it they could just say they were not interested. BUFFIN reiterated that they were definitely interested and Carlton nodded in agreement. BUFFIN added "It's done." SA M. Demas then asked if they had done such a robbery before. BUFFIN stated that they had "a couple of times". Therefore, SA M. Demas asked if there were two people in the drug house, how many individuals would BUFFIN and Carlton bring. BUFFIN stated that there would be a total of four individuals to commit the robbery. SA M. Demas said that he would need to meet the others that BUFFIN and Carlton would bring to do the robbery so that they would get to see SA M. Demas before the robbery so as not to hurt the wrong person. They agreed to meet again so that SA M. Demas could meet the new people and so BUFFIN could explain his plan to SA M. Demas. Carlton stated that they would come in and make everybody lay down, including SA M. Demas. Carlton said that they would make it look

5

like SA M. Demas was being robbed too and, in fact, asked if SA M. Demas had a problem with getting slapped in the face to make it look more believable.

12.     BUFFIN said he would formulate a plan to execute the robbery. BUFFIN stated that he would be in contact with his associates concerning the robbery and he would formulate a complete plan at that time. So, SA M. Demas then asked BUFFIN how he wanted to divide the cocaine they would be robbing from this house. SA M. Demas proposed a 50/50 split. BUFFIN responded that he wanted it to be 60/40, with his people getting the 60%. BUFFIN again stated that the next time they meet they would have their plan together. At this point SA M. Demas asked for BUFFIN'S phone number so they could stay in contact and BUFFIN provided his number to SA M. Demas. SA M. Demas asked BUFFIN if they would be ready to do the robbery by the end of March. BUFFIN assured him that they would be and said he was "going to get on it right now". SA M. Demas then turned and looked directly at Carlton and asked what he thought. Carlton nodded his head in agreement. SA M. Demas asked if he thought there would be any issues. Carlton said "Aw no". As SA M. Demas rehashed the story, BUFFIN asked if the other individual in the house carried a weapon also. SA M. Demas said he did not know but had never seen one.

13.     SA M. Demas then explained that each kilo of cocaine had specific markings. SA M. Demas stated that BUFFIN and his associates would have to re-package the cocaine because of these markings, due to the fact that the organization would know it was their cocaine by these particular markings. BUFFIN agreed. BUFFIN then stated that he really did not have any further questions but assured SA M. Demas that the robbery was going to get done. BUFFIN said that they would be ready when SA M. Demas called and that "it was gonna go down". SA M. Demas, BUFFIN and Carlton agreed to stay in touch and meet again when they got their entire

crew ready. BUFFIN, Carlton and the CI then exited the ATF Undercover Vehicle. This meeting was recorded.

### The Undercover Meeting on March 27, 2012

14.     On March 27, 2012, at approximately 3:00 PM, SA M. Demas travelled to the area of 540 Hegenberger Road, (Coliseum Shell Gas Station) Oakland, CA, for the purpose of meeting Isaac BUFFIN to discuss the robbery as described above.

15.     When SA M. Demas arrived at 540 Hegenberger, while sitting in his parked ATF Undercover Vehicle, he was contacted by BUFFIN. BUFFIN and a black male entered the ATF Undercover Vehicle from the passenger side, with BUFFIN getting in the front seat and the black male entering the rear passenger side. Once inside, the three of them exchanged greetings. At that time, the as yet unidentified black male introduced himself to SA M. Demas as "Rod". It should be noted that SA M. Demas identified "Rod" on a later date as Kelvin Tyray MCALLISTER.

16.     Then, SA M. Demas asked BUFFIN if he had explained the details of the robbery to MCALLISTER. BUFFIN essentially told SA M. Demas to repeat the story to MCALLISTER to make sure he knew all the details. SA M. Demas explained to BUFFIN and MCALLISTER that he was a disgruntled courier of three (3) to four (4) kilograms of "coke" for a Mexican illicit drug organization. SA M. Demas told BUFFIN and MCALLISTER the organization ships the cocaine into the Oakland area and then contacts SA M. Demas to come collect the cocaine. Once there, SA M. Demas advised that he observes two (2) individuals in the residence containing the cocaine, one of which SA M. Demas knew was armed with a firearm. SA M. Demas further advised that while waiting to collect his cocaine, he observes an additional four (4) to six (6) kilograms of cocaine in the residence. MCALLISTER then asked where it would

7

take place. SA M. Demas explained that the location of the stash house changed each and every time he dealt with them so he would not know the address until the day he had to pick up the drugs. SA M. Demas asked them if robberies of that type were something that they had done before. MCALLISTER said "Yeah, I've done it before".

17.　　SA M. Demas then asked how they planned on doing it. MCALLISTER stated that they would be with SA M. Demas when the call came in to give him the address of the stash house. Then they would follow SA M. Demas to the location. MCALLISTER wanted to clarify if there were two people in the house, which SA M. Demas confirmed. MCALLISTER also asked if the man at the door was the one with the gun. SA M. Demas said that he was. MCALLISTER then stated that they "had to get up on him first" (referring to the man in the stash house with the weapon). SA M. Demas inquired as to what MCALLISTER wanted him to do. MCALLISTER went on to explain that as SA M. Demas entered, "I'm comin in behind you, my guys comin in behind you. You don't know what's goin on, black guys comin in with masks on". MCALLISTER said by doing it this way, SA M. Demas would not be suspected of being involved. SA M. Demas again said that the drugs would be in on Friday and asked if MCALLISTER could have his people ready. MCALLISTER stated that he was indeed ready for Friday or whatever day SA M. Demas told him to be free.

18.　　SA M. Demas told MCALLISTER that during the previous meet with BUFFIN, it had been decided that BUFFIN and his crew would get 60% of the proceeds and SA M. Demas would take 40%. MCALLISTER agreed with that split. SA M. Demas then explained that there would be no money in the house, strictly cocaine. Therefore, SA M. Demas explained to BUFFIN and MCALLISTER, that unless they had a market for the cocaine the robbery would be useless to them. MCALLISTER responded "I got a market for it. That's what I do". He went on

to explain that he already knew what he was going to do with the cocaine he was getting and that he had a market for it.

19.     SA M. Demas then explained that each kilo of cocaine had specific markings. SA M. Demas stated that MCALLISTER and his associates would have to re-package the cocaine because of these markings, due to the fact that the organization would know it was their cocaine by these particular markings. MCALLISTER agreed and said "it's a cartel". MCALLISTER stated that once he had the cocaine, it would be re-packaged and broken down into ounces.

20.     MCALLISTER then proposed that they meet again on Thursday to discuss the details of the robbery again and Friday get together for the robbery. SA M. Demas asked how many people MCALLISTER planned to use for the robbery and MCALLISTER stated "three". SA M. Demas explained the importance of SA M. Demas seeing and meeting each member of MCALLISTER's crew so they knew and could identify SA M. Demas when they came into the stash house. MCALLISTER also stated that he did not care about the Mexicans in the drug house. MCALLISTER stated they (the Mexicans' in the house) can get more of the drug, "we need to get ours". Again, MCALLISTER stated that he wanted SA M. Demas and his crew to meet again on Thursday and that he was going to bring the other participants with him on that day. SA M. Demas asked BUFFIN if he was good with all of the arrangements and he acknowledged that he was. MCALLISTER stated that BUFFIN would get his share "off the top".

21.     SA M. Demas then said he did not want anyone getting hurt, referring to MCALLISTER, his crew and SA M. Demas. MCALLISTER seemed surprised and asked M. Demas "you don't think I'm not gonna have to hurt dude when I come up in there?" SA M. Demas realized that MCALLISTER had misunderstood his meaning and clarified that he was

only concerned about MCALLISTER'S crew and himself. MCALLISTER said that when his crew enters with their guns, the armed guard is not going to have any choice; he was going to have to give up. MCALLISTER said that his crew would have their guns in the guy's face. MCALLISTER said he did not have any questions at the time and proposed another meet on Thursday so they could talk again. Then, according to MCALLISTER, on Friday, since "we know that's the day, we get together, we all ready, they tell you what side to be on, we already be over there, we'll be over there waiting." MCALLISTER said then that when SA M. Demas got the call, MCALLISTER and his crew would follow him to the house. Once there, MCALLISTER stated that his crew would follow right behind SA M. Demas into the house and make everybody get down on the floor. SA M. Demas then addressed the fact that MCALLISTER had said there would be three people on his crew. SA M. Demas asked for reassurance that the unknown third member of the crew would be able to handle the situation. MCALLISTER assured SA M. Demas that he did not have to worry about it and that they were aggressive when they needed to be.

22. MCALLISTER again asked SA M. Demas to confirm that there would be two people in the house. SA M. Demas again said that was all he had ever seen. MCALLISTER stated that was all he needed to know. MCALLISTER stated that they would quickly get on the person who was answering the door, and while making a motion as if MCALLISTER was carrying a long gun (rifle), MCALLISTER said that they would order that person to the floor. MCALLISTER said that they would then disarm him, even if MCALLISTER and his crew had to shoot him and "it would be over for his ass". MCALLISTER went on to say that when SA M. Demas walked into the house, MCALLISTER and his crew would push in directly behind and not give the person in the house a chance to reach for his weapon. MCALLISTER stated "that's

how we're going to do it. I guess we'll get together Thursday". BUFFIN nodded in agreement.
MCALLISTER then directed BUFFIN to give SA M. Demas MCALLISTER's telephone
number so they could stay in contact. BUFFIN provided SA M. Demas with MCALLISTER's
telephone number. MCALLISTER then requested that SA M. Demas enter him into SA M.
Demas' cellular telephone as "Twin."

23.     SA M. Demas again asked if they had any questions. MCALLISTER stated that
they could discuss that Thursday when they meet and that they would all be together on Friday
awaiting the call. MCALLISTER then said that SA M. Demas' portion of the cocaine would be
waiting for him when he returned. MCALLISTER then said "Thursday we eat, Friday we're
on". MCALLISTER then told SA M. Demas to call him if he had anything additional. SA M.
Demas agreed. SA M. Demas, MCALLISTER and BUFFIN then shook hands, and BUFFIN and
MCALLISTER exited the ATF Undercover Vehicle. This meeting was recorded.

### The Undercover Meeting on March 29, 2012

24.     On March 29, 2012, at approximately 11:42 AM, SA M. Demas received a call on
his Undercover Phone from Isaac BUFFIN who is known to SA M. Demas through two previous
meets regarding the robbery as described above. Upon answering, BUFFIN asked SA M. Demas
if they were still going to meet at 2:00 PM. This was in reference to a previous meeting between
SA M. Demas, BUFFIN and Kelvin MCALLISTER regarding the armed robbery, wherein they
agreed to meet on March 29, 2012 to further discuss the details and finalize plans for the
robbery. SA M. Demas told BUFFIN that he would still meet BUFFIN and MCALLISTER at
the Denny's Restaurant, near Hegenberger and I-880 and would call BUFFIN when he was en
route. BUFFIN said he would wait for SA M. Demas to call then proceed to the Denny's. SA
M. Demas asked if MCALLISTER and the "new" person would both be there also. BUFFIN

assured SA M. Demas that they would. This call was not recorded as it was an incoming call and no recording equipment was readily available.

25.     As SA M. Demas travelled to the area of 601 Hegenberger Road, (Denny's Restaurant), he placed an unrecorded call only to advise BUFFIN that SA M. Demas was en route to the meet location. BUFFIN told SA M. Demas that "they" would be on their way to meet SA M. Demas. Shortly thereafter, SA M. Demas arrived at Denny's and at the same time a gold colored Jaguar, bearing California license 6UIX461, pulled up next to SA M. Demas who was in an ATF Undercover Vehicle. This Jaguar was occupied by MCALLISTER and three black males. (SA M. Demas identified the three black males on a later date as Anthony Jose MEYERS, Patrick Anthony JACKS, and Antonio Manzia MCBRIDE.) As they exited their vehicle, and SA M. Demas exited the ATF Undercover Vehicle, they exchanged greetings. MEYERS was introduced as MCALLISTER's little brother. JACKS introduced himself as "PAT". MCBRIDE introduced himself as "TONE". MCALLISTER also greeted SA M. Demas. Everyone agreed to go into the restaurant and discuss their plan. As they walked toward the restaurant, SA M. Demas asked MCALLISTER where BUFFIN was. MCALLISTER said that BUFFIN had to go to see his probation officer so he would not get arrested. SA M. Demas told MCALLISTER that BUFFIN had called him earlier to discuss the meeting spot and MCALLISTER stated that he instructed BUFFIN to call SA M. Demas to confirm that they were still meeting.

26.     Once inside the restaurant MCALLISTER told SA M. Demas that MCALLISTER had explained the details to MEYERS, JACKS and MCBRIDE, but wanted for SA M. Demas to tell them in case he had left out some of the details. SA M. Demas agreed.

27.    SA M. Demas explained to them that he was a disgruntled courier of three (3) to

four (4) kilograms of "coke" for a Mexican illicit drug organization. SA M. Demas told the four

of them that the organization ships the cocaine into the Oakland area and then contacts SA M.

Demas to come collect the cocaine. Once there, SA M. Demas advised that he observes two (2)

individuals in the residence containing the cocaine, one of which SA M. Demas knew was armed

with a firearm. SA M. Demas further advised that while waiting to collect his cocaine, he

observes an additional four (4) to six (6) kilograms of cocaine in the residence. MCALLISTER

then asked where it would take place. SA M. Demas explained that the location of the stash

house changed each and every time he dealt with them so he would not know the address until

the day he had to pick up the drugs. At one point MCBRIDE asked SA M. Demas if it was the

same two people in the house all the time. SA M. Demas told him that it was. Later, MCBRIDE

also asked if they only had one weapon. SA M. Demas explained that he only sees one when he

is in there but is not sure if that is the only one. MCALLISTER explained to the others that the

person with gun was the security for the house and they needed to get on him quickly because his

job is to protect the house.

28.    JACKS commented that other people were obviously coming to pick up the

cocaine from the house and that was why there were additional kilos. SA M. Demas agreed. As

the conversation continued, SA M. Demas mentioned that he and MCALLISTER had agreed on

a 60/40 split. SA M. Demas said if they were not happy with that arrangement they could

discuss it. JACKS stated that he was satisfied and there would be no dispute. MEYERS agreed.

SA M. Demas then told him he was concerned about the violence if they were inexperienced or

did not do the robbery correctly. So, SA M. Demas asked them if they had all done robberies of

this type before and all four of them told SA M. Demas that they had. SA M. Demas then told

them that there would be no money in the house, so they had to have a market for the cocaine or the robbery would be pointless. Again, they all acknowledged that they would be able to sell the cocaine to make money without a problem. At this point, MCALLISTER told SA M. Demas that after they committed the robbery, MCALLISTER would meet SA M. Demas at this same restaurant so he could give SA M. Demas his four kilos of cocaine.

29.     SA M. Demas continued providing the details when MCBRIDE asked if SA M. Demas thought they would have "to do something" to the person who would answer the door. SA M. Demas said he did not know how the person would react. MEYERS then stated that they needed to handle the person at the front door immediately so they could get the firearm from him. MEYERS, MCALLISTER, JACKS and MCBRIDE then discussed how to best enter the house and subdue the individuals. JACKS then asked about the make-up of the neighborhood and the type of houses. SA M. Demas explained that the houses were always fairly small and that the neighborhood was a mix of Blacks, Mexicans and Whites. MCBRIDE asked if the drug dealers would be able to figure out that SA M. Demas was involved. SA M. Demas explained that he never associated with Blacks and therefore no one would suspect him if the robbers were Black. JACKS stated that they wanted to know these things because it may "get ugly". MCALLISTER stated that he did not think it would have to "get ugly".

30.     SA M. Demas said to MCBRIDE that he looked like he was thinking about something. MCBRIDE told SA M. Demas that he was thinking about all the details because "this is serious". MCBRIDE then again inquired if there were two people in the stash house. Again, SA M. Demas stated that was all he ever saw. After the four subjects talked about further details of entering the house, MCBRIDE stated "I'm with it man. This is my team right here. I'm with it, man". As MCBRIDE made that statement, MEYERS, MCALLISTER and JACKS all

nodded in agreement. SA M. Demas then asked if anyone else would be involved.

MCALLISTER said that only the people at this meeting would be going in the house for the

purpose of the robbery. Therefore, SA M. Demas inquired as to whether Isaac BUFFIN would

be going also. MCALLISTER stated that BUFFIN would not be going but that BUFFIN would

get paid out of MCALLISTER's share of the cocaine that was taken from the stash house. SA

M. Demas expressed his concern for getting SA M. Demas' portion of the robbery after it was

done. MCALLISTER assured him that they would deliver his portion back to the Denny's

Restaurant later on the same day of the robbery. SA M. Demas again stated the importance of

being on time and asked them if they would be ready on Friday. JACKS, MEYERS,

MCALLISTER and MCBRIDE all acknowledged that they would be ready to commit the

robbery on Friday.

     31.    At one point, MCBRIDE asked if SA M. Demas had only seen handguns in this

house. SA M. Demas said that was what he would see each time. SA M. Demas went on to

describe the "weapon" he supposedly sees in this stash house. After describing it, JACKS said

"it's a Smith and Wesson". MCBRIDE reiterated that the person who answers the front door is

the main target and it was most important to disarm him immediately. JACKS then inquired

about a back door at the residence. Therefore, SA M. Demas advised JACKS that he has never

been in the position to see a back door. MCBRIDE suggested that they continue their meeting

on the parking lot because too many patrons of the restaurant were watching them. Therefore,

JACKS, MCALLISTER, MCBRIDE and MEYERS all proceeded to the parking lot with SA M.

Demas.

     32.    As they walked back to the vehicles, JACKS told SA M. Demas that they were

like "ghosts" and wanted to do it right so it relieves SA M. Demas of being a suspect. SA M.

Demas then asked if they needed a rental car for the robbery. Initially, MEYERS said they could use his car, the Jaguar they had arrived in for this meet. However, MCBRIDE said he wanted a larger vehicle so they could maneuver more quickly. SA M. Demas agreed to handle the rental of that larger vehicle for them. JACKS then asked "What's the most craziest place you met them at?" JACKS said he wanted to picture what to expect.

33.     SA M. Demas asked if they all knew what was going on. MEYERS, JACKS, MCBRIDE and MCALLISTER all acknowledged that they knew what the robbery was all about and each stated that they were willing to do it. SA M. Demas then asked if they had their weapons already. They said that they did. SA M. Demas then specifically asked MCBRIDE if he was in agreement with the robbery too. MCBRIDE assured him that he was. SA M. Demas then told MCALLISTER that he would call him at 10:00 AM on Friday, March 30, 2012, to ensure that they were all together and ready. They then again assured SA M. Demas that they were ready. MCBRIDE again inquired about the ages and sizes of the people in the house. MCBRIDE again told SA M. Demas he was ready to do the robbery. SA M. Demas then again asked if they were sure they wanted to do it and told them if they were not committed they could just walk away. MEYERS, JACKS, MCBRIDE and MCALLISTER said that they all were in for the robbery. They then agreed amongst themselves that they would be together at 10:00 AM on Friday, awaiting the call from SA M. Demas. MEYERS, JACKS, MCBRIDE and MCALLISTER then entered the above mentioned Jaguar and left the area. This meeting was recorded.

### The Undercover Meeting and Arrest on March 30, 2012

34.     On March 30, 2012, SA M. Demas arranged to meet with MCALLISTER and his associates on this day for the purpose of carrying out the above described robbery of a "stash"

house of cocaine. At approximately 11:15 AM, SA M. Demas, who was in an ATF Undercover Vehicle, met with MCALLISTER, MCBRIDE, JACKS, and MEYERS, who were all in the gold colored Jaguar referenced above at a Best Buy parking lot located at 3700 Mandela Parkway, Emeryville, California. At this time, MCALLISTER told SA M. Demas that they were waiting on additional individuals.

     35.    A short time later, SA M. Demas observed a silver colored Mercedes sedan bearing California License Plate 6SEV481 arrive in the Best Buy parking lot. At this time, SA M. Demas instructed MCALLISTER to follow SA M. Demas to a nearby Extended Stay America Hotel parking lot located at 3650 Mandela Parkway, Emeryville, California.

     36.    At the Extended Stay America Hotel parking lot, SA M. Demas made contact with MCALLISTER, MCBRIDE, JACKS, and MEYERS and observed the silver Mercedes sedan park nearby. Shortly after, JACKS and MCBRIDE walked to the trunk of the silver Mercedes sedan. SA M. Demas observed JACKS and MCBRIDE retrieve three pistols from the trunk of the silver Mercedes sedan and put the firearms into an ATF Undercover Mini-Van which was parked nearby. SA M. Demas then observed JACKS walk to the passenger compartment of the silver Mercedes sedan and then turn back towards the passenger compartment of the ATF Undercover Mini-Van.

     37.    SA M. Demas also observed a male (shortly thereafter identified as Azeem Najee AHMAD) exit the Mercedes sedan and AHMAD was introduced to SA M. Demas by JACKS. SA M. Demas inquired if AHMAD knew that the purpose of the meeting was to commit a robbery for cocaine and that there was an armed individual inside of the house containing the cocaine. AHMAD confirmed that he had previously committed similar acts and then confirmed his knowledge and participation of the impending robbery.

38.    After a short time, SA M. Demas observed JACKS retrieve one of the pistols which had been put into the ATF Undercover Mini-Van and walk to the silver Mercedes sedan where AHMAD, who was inside of the silver Mercedes sedan, took possession of the firearm. A short time later, the silver Mercedes sedan departed the hotel parking lot area. SA M. Demas asked MEYERS what was going on and MEYERS replied "See what that was, he was gonna be our watch-out in the car with the car running but now he gone." This meeting was recorded.

39.    A few moments later, SA M. Demas then walked away from the group and Agents initiated the arrest of MCALLISTER, MCBRIDE, JACKS, and MEYERS. All four individuals immediately ran away from the approaching Agents. All four individuals were subsequently caught and arrested a short time later in the Extended Stay America Hotel parking lot. Upon searching all four individuals, the following items were recovered (this is not a complete list of the items recovered):

- Black gloves (MCALLISTER's person)
- Black knit beanie (MCBRIDE's person)
- Black gloves (JACKS' person)

40.    Agents then conducted a search of the above mentioned gold Jaguar and ATF Undercover Mini-Van which were parked a short distance away in the same parking lot. The following items were recovered from the ATF Undercover Mini-Van during the search (this is not a complete list of the items recovered):

- Ruger P95 9mm pistol (Serial Number: 316-83132) found loaded with 9 rounds in the magazine and no round in the chamber (I am aware that this gun has been reported as stolen.)
- Glock Model 19 9mm pistol (Serial Number: PYP293) found loaded with 9 rounds in the magazine and one round in the chamber

- Smith and Wesson SW40VE .40 caliber pistol (Serial Number: DWE6890) found loaded with ten rounds in the magazine and no round in the chamber

41. During the time at which Agents commenced the arrest of MCALLISTER, MCBRIDE, JACKS, and MEYERS, additional units observed the silver Mercedes sedan traveling though a nearby parking lot. SA Long and I observed the Mercedes sedan traveling in an adjacent parking lot and at this time, I activated the red and blue emergency lights of my unmarked ATF Vehicle and attempted to contact the occupants of the Mercedes sedan. As SA Long and I exited our vehicle, the Mercedes sedan accelerated rapidly and drove around my ATF Vehicle and traveled westbound on 40th Street at a high-rate of speed.

42. At this time, a helicopter unit conducted surveillance of the silver Mercedes sedan as it traveled at a high-rate of speed to the area of the 5800 block of Dover Street, Oakland, California. Three individuals were then observed exiting the vehicle and traveling on foot to a residence located at 741 59th Street, Lower Unit, Oakland, California. After a short time, Agents/Officers contacted and detained the three individuals who were identified as Christopher McMillon, Azeem Najee AHMAD (B/M, DOB: 03/24/1992), and Ishmael Stiggs.

43. During this time, Oakland Police Department Officers Williams Pappas and Todd Bergeron searched the route which had been traveled by the silver Mercedes sedan. Officer Pappas and Officer Bergeron subsequently located a Glock Model 22 .40 caliber pistol (Serial Number: DDR348US) near the roadside near the intersection of Powell Street and Beaudry Street, Oakland, California. The firearm was found to be loaded with nine rounds in the magazine and one in the chamber.

44. SA Carr and SA Zayas later interviewed McMillon. After being advised of his Miranda rights and then waiving those rights, McMillon provided a statement to Agents.

McMillon stated that he had possessed a firearm when he left his residence on this date and carried the firearm in his waistband. McMillon explained that he later traveled in a silver Mercedes sedan to an Extended Stay America Hotel parking lot in Emeryville, California. At this location, McMillon explained that JACKS asked for the firearm and McMillon provided the firearm to JACKS. After a short time, JACKS returned to the silver Mercedes sedan and gave the firearm to AHMAD who was in the silver Mercedes sedan. McMillon stated that after departing the above described parking lot in the silver Mercedes sedan and then observing that police were attempting to contact them, AHMAD threw the firearm out of the vehicle.

45.     Following the arrest operation, SA M. Demas called BUFFIN and asked to confirm that BUFFIN would still be receiving a portion of the proceeds (cocaine) from the robbery. BUFFIN confirmed that he would still be receiving a portion of the proceeds from the robbery. It should be noted that BUFFIN was present for the undercover meetings on March 21, 2012 and March 27, 2012. To date, BUFFIN has not been taken into custody.

## IV.     SUSPECTS' BACKGROUND

46.     A review of criminal history records for Anthony Jose MEYERS (B/M, DOB: 09/07/1983) indicated that MEYERS has convictions for offenses including:

- Possession/Purchase of Cocaine Base for Sale (2003)
- Possession/Purchase of Cocaine Base for Sale (2006)
- Possession of Marijuana for Sale (2008)
- Sale/Furnish Marijuana/Hash (2009)
- Possession/Purchase Controlled Substance for Sale (2011)

47.     A review of criminal history records for Kelvin Tyray MCALLISTER (B/M, DOB: 11/23/1975) indicated that MCALLISTER has convictions for offenses including:

- Transport/Sale of a Controlled Substance (1994)

- Transport/Sale of a Controlled Substance (1997)

- Felon in Possession of a Firearm (2008)

48.   A review of criminal history records for Patrick Anthony JACKS (B/M, DOB: 07/14/1981) indicated that JACKS has convictions for offenses including:

- Burglary: Second Degree-Misdemeanor (2002)

- Force/Assault with a Deadly Weapon-Not Firearm-Misdemeanor (2009)

49.   A review of criminal history records for Antonio Manzia MCBRIDE (B/M, DOB: 06/23/1984) indicated that MCBRIDE has convictions for offenses including:

- Burglary: First Degree (2003)

- Inflict Corporal Injury on Spouse/Cohabitant (2008)

50.   A review of criminal history records for Isaac Darrell BUFFIN (B/M, DOB: 01/26/1990) indicated that BUFFIN has been convicted of a felony for:

- Possession/Purchase of Controlled Substance for Sale (2010)

51.   A review of criminal history records for Azeem Najee AHMAD (B/M, DOB: 03/24/1992) indicated that AHMAD has not previously been arrested.

## V.   **INTERSTATE COMMERCE ELEMENT OF NARCOTICS**

52.   Based on my experience and training, as well as on my conversations with other law enforcement officers who have experience investigating cocaine importation and trafficking, I know that cocaine is a controlled substance that is derived from coca leaves that are only grown outside of the United States, mostly in Colombia. These coca leaves are harvested outside the United States and are typically processed into cocaine before being imported into the United States for distribution.

## VI.   CONCLUSION

53.   Based on the foregoing information, your affiant respectfully submits these facts as evidence that probable cause exists to believe that the following individuals violated the laws of the United States, specifically, 21 U.S.C. §§ 846, 841(a)(1)(A):

- Isaac Darrell BUFFIN (B/M, DOB: 01/26/1990)
- Anthony Jose MEYERS (B/M, DOB: 09/07/1983)
- Kelvin Tyray MCALLISTER (B/M, DOB: 11/23/1975)
- Patrick Anthony JACKS (B/M, DOB: 07/14/1981)
- Antonio Manzia MCBRIDE (B/M, DOB: 06/23/1984)
- Azeem Najee AHMAD (B/M, DOB: 03/24/1992)

I declare under the penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

Daniel W. Demas
Special Agent (ATF)

Subscribed and sworn to me this
/5?   Day of April 2012, at
Oakland, California.

Honorable Donna M. Ryu
United States Magistrate Judge
Northern District of California